UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
NIMIO G. SISA,

                    Plaintiff,

      -against-

WESTROCK SERVICES, LLC,
                    Defendant.
------------------------------------------------------X

CV: 19-6000

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Nimio G. Sisa, by his attorneys SCOTT MICHAEL MISHKIN, P.C., complaining of the defendant, alleges as follows:

### PRELIMINARY STATEMENT

This case is brought pursuant to 42 U.S.C. §§ 2000e-2000e-17 (Title VII) for WestRock Services, LLC (defendant) discriminatory treatment against plaintiff due to plaintiff's Race and National Origin and retaliation against plaintiff but for his engagement in protected activity. This case is brought pursuant to the continuing violation doctrine as the name Supervisors discriminated against plaintiff outside and within the three day statute of limitation period, that being December 28, 2017.

### JURISDICTION

FIRST:      The jurisdiction of the Court over this controversy is based upon 28 U.S.C. § 1331, and Title VII 42 U.S.C. §§ 2000 *et seq.*

### VENUE

SECOND:      The unlawful practices alleged below were committed within the State of New York, County of Suffolk.

THIRD: At the time of the unlawful practices, plaintiff was a resident of Suffolk County in the Eastern District of the United States District Court of New York.

FOURTH: Defendant conducts substantial business in Suffolk County in the State of New York, at 217 River Avenue, Patchogue, New York 11772.

FIFTH: This Court is hereby the proper venue under 28 U.S.C. § 1391(b).

## FACTS

SIXTH: At the time of the causes of action, plaintiff, a Black Hispanic, worked for defendant as its Production Manager for defendant's Application Division at defendant's Ronkonkoma, New York location.

SEVENTH: Plaintiff began his highly dedicated unblemished career at defendant on September 25, 1999, in the position of Warehouse Worker.

EIGHTH: Throughout his career at defendant, plaintiff received a series of promotions with his last promotion being to the title of Production Manager.

NINTH: Plaintiff was wrongfully terminated on November 15, 2018, due to his Race and National Origin and in direct retaliation of his engagement in protected activity.

TENTH: The names and titles of defendants' Management that discriminated and/or retaliated against plaintiff were its Regional Director of Human Resources, Jennifer Carey (Carey); its Human Resource Generalist, Cinthia Pedro (Pedro); Facility Director, Tom Shouthworth (Shouthworth); Shipping and Receiving Manager, Ronald Tarantino (Tarantino); and its Regional Director of Operations, Nick Shore (Shore).

ELEVENTH: On on about May 2017, Carey began speaking to plaintiff in a rude manner and would degrade plaintiff when talking with him, but did not speak to other non-Black Hispanic employees in a rude or degrading manner.

TWELFTH: On or about February 2018, Carey began to sabotage plaintiff's career due to his Race and National Origin, when she told plaintiff he was not permitted to speak to his direct reports and that he was only permitted to bring issues to Carey and Pedro.

THIRTEENTH: Carey also directed all of plaintiff's direct reports that if plaintiff ever spoke to them about any issues related to their job, they were to notify Human Resources immediately.

FOURTEENTH: This demonstrates Carey's disparate treatment of plaintiff due to his Race and National Origin, as Carey did not treat similarly situated non Black Hispanic Managers in this manner and the hostile work environment plaintiff was being subjected to.

FIFTEENTH: Tarantino also engaged in discrimination against plaintiff due to his Race and National Origin by willfully interfering with his work in order to cause harm to plaintiff's career.

SIXTEENTH: Specifically, for no legitimate business reason, Tarantino removed plaintiff's Warehouse support team, leaving plaintiff to handle all of the work and then proceeded to direct plaintiff to perform tasks that were outside of his title and job description.

SEVENTEENTH: Shouthworth also discriminated against plaintiff due to his Race and National Origin when plaintiff asked him for assistance to replace the vacant position due to Tarantino's discriminatory treatment of him, and plaintiff's requests were ignored.

3

EIGHTEENTH: Plaintiff also complained to Southward that Tarantino directed him to perform tasks that were outside of his title and job description in the warehouse.

NINETEENTH: Shouthworth ignored plaintiff's complaint of Tarantino's discriminatory treatment of plaintiff.

TWENTY: During the Summer of 2018, plaintiff continued to send e-mails to Southward requesting help in the warehouse, but plaintiff believes due to his National Origin and Race, Southward did not support or address plaintiff's good faith efforts for the success of defendant's business.

TWENTY FIRST: Carey and Shouthworth furthered their discriminatory treatment of plaintiff when plaintiff complained of an employee he supervised who abandoned her job.

TWENTY SECOND: After plaintiff instructed one of his direct reports, Silvia Contreras (Contreras) to not throw boxes containing bottles, she walked out on her job.

TWENTY THIRD: Despite plaintiff immediately contacting Carey and Shouthworth, of Contreras's insubordination, on October 3, 2018, and with a follow up to them on October 4, 2018, plaintiff was ignored and Contreras was awarded to work in another department at defendant's Patchogue, New York location.

TWENTY FOURTH: As demonstrated earlier herein, Carey and Shouthworth purposefully ignored plaintiff's request for help as for and in regard to Contreras's insubordination and rewarded her in order to discriminate against plaintiff due to his National Origin and Race.

TWENTY FIFTH:   On October 5, 2018, Tarantino, in another discriminatory act, directed plaintiff to perform duties outside his title, specifically to use a forklift to load pallets on a truck.

TWENTY SIXTH:   Despite plaintiff not be certified to operate a forklift, and was not permitted to operate the forklift, Tarantino's directive was based on plaintiff's National Origin and Race,

TWENTY SEVENTH:   And the fact that Tarantino was not plaintiff's direct supervisor, further demonstrates that Tarantino was motivated with discriminatory intent when directing plaintiff to perform a task that he was not certified to perform and below his title.

TWENTY EIGHTH:   Despite plaintiff advising Tarantino that he was not a warehouse worker and was in fact a Manager, and the fact he had been requesting additional warehouse workers to Southworth for months, plaintiff requested he find another solution to operate the forklift.

TWENTY NINTH:   In a further demonstration of discrimination against plaintiff due to his National Origin and Race, Shore told plaintiff that his response to Tarantino was unacceptable and unprofessional.

THIRTY:   Shore was fully aware that plaintiff had been requesting additional warehouse workers as he was copied on the e-mails for said help that were sent to Shouthworth by plaintiff.

THIRTY-FIRST:   Plaintiff advised Shore his intent was not to be unprofessional but the fact remained that plaintiff was a Manager and not certified to operate the forklift.

5

THIRTY SECOND: As a result of plaintiff's good faith belief that he was being discriminated against in the workplace, plaintiff formally complained to Shouthworth that he was being discriminated in the workplace due to his being an Hispanic Manager.

THIRTY THIRD: As a pretext to their discrimination against plaintiff due to National Origin and Race, and in retaliation of his formal discrimination complaint to Shouthworth, eight days after plaintiff reported Contreras's insubordination to to Carey and Shouthworth, on October 11, 2018, Carey, Pedro and Taratntono went to plaintiff's department and interviewed employee witnesses, who corroborated plaintiff's formal complaints to Carey and Shouthworth of Contreras's insubordination.

THIRTY FOURTH: Despite the corroboration, Pedro and Tarantino, motivated with discriminatory and retaliatory intent, moved forward to harm plaintiff's career and fabricated their findings to go against plaintiff.

THIRTY FIFTH: Specifically, on October 25, 2018, Pedro and Tarantino went to plaintiff's office and presented him with a fabricated disciplinary memo that was contrary to witnesses interviews, finding plaintiff insubordinate and insisted that he sign the memo and acknowledge the findings, despite the memo's false findings, further demonstrating discrimination against plaintiff and retaliation for his engagement in protected activity.

THIRTY SIXTH: These discriminatory and retaliatory acts as for and against plaintiff created a hostile work environment for plaintiff.

THIRTY SEVENTH: Since he began his employment at defendant, that being for the past nineteen years, plaintiff had never ever had any written warnings, and/or fabricated written warnings against him in regard to his management abilities and/or performance of his work.

THIRTY EIGHTH: Pedro's and Tarantino's willful adverse actions were based on plaintiff's National Origin and Race and further demonstrated the hostile work environment he was being subjected to.

THIRTY NINTH: The fabricated memo included false information that plaintiff treated employees badly; threatened employees and intimidated employees.

FORTY: The pretextual memo also included language that plaintiff provided false information to Human Resources.

FORTY FIRST: At no time did plaintiff ever provide false statements to Human Resources and at no time what so ever in his entire career did he threaten, intimidate, or treat any employee badly and as such, plaintiff would not sign the document as directed to do so by Pedro.

FORTY SECOND: Despite the truth, Pedro, in the ultimate discriminatory and retaliatory act against plaintiff insisted that plaintiff resign, and was terminating plaintiff due to his National Origin and Race and in retaliation of his engagement in protected activity.

FORTY THIRD: Plaintiff made it clear in writing and verbally from October 29, 2018, up to his wrongful termination on November 15, 2018, when he was replaced by a White American, that he never wanted to resign and was not resigning.

FORTY FOURTH: On October 29, 2018, Pedro sent plaintiff an e-mail that defendant accepted his resignation.

FORTY FIFTH: Plaintiff made it clear that he never voluntarily resigned and was not resigning and/or giving up his nineteen year career, especially since it was based on a fabricated investigation report and false memo.

FORTY SIXTH: Pedro told plaintiff defendant would not accept any resignation.

7

FORTY SEVENTH: Any legitimate business reason for its actions against plaintiff was a pretext, as the findings in their investigation were purposefully altered and false and therefore it was more likely than not defendant's actions against plaintiff were motivated with the discriminatory and retaliatory intent.

FORTY EIGHTH: Defendant's harassment of plaintiff was sufficiently severe and/or pervasive that it created an objectively hostile work environment and/or abusive work environment based on his National Origin and Race and in retaliation of engagement in protected activity.

FORTY NINTH: On November 15, 2018, plaintiff was terminated due to his National Origin and in Retaliation of a formal complaint that he was being discriminated against because he was Hispanic and was then replaced with an White American named Chris Miller.

FIFTY: This action was commenced within 90 days of plaintiff receiving his Notice of Right To Sue Letter from the Equal Employment Opportunity Commission.

WHEREFORE, plaintiff demand a judgment against the defendants as follows:

1. For a money judgment representing actual damages for defendant's discrimination against plaintiff do to his National Origin and Race in violation of Title VII, 42 U.S.C. §§ 2000 *et seq.*,;

2. For a money judgment representing compensatory damages for defendant's discrimination against plaintiff do to his National Origin and Race in violation of Title VII, 42 U.S.C. §§ 2000 *et seq.*,;

3. For a money judgment representing punitive damages for defendant's discrimination against plaintiff do to his National Origin in violation of Title VII, 42 U.S.C. §§ 2000 *et seq.*,;

4. For a money judgment representing emotional damages for defendant's discrimination against plaintiff do to his National Origin and Race in violation of Title VII, 42 U.S.C. §§ 2000 *et seq.*,;

5. For a money judgment representing actual damages for defendant's retaliation against plaintiff do to his engagement in protected activity in violation of Title VII, 42 U.S.C. §§ 2000 *et seq.*,;

6. For a money judgment representing compensatory damages for defendant's retaliation against plaintiff do to his engagement in protected activity in violation of Title VII, 42 U.S.C. §§ 2000 *et seq.*,;

7. For a money judgment representing punitive damages for defendant's retaliation against plaintiff do to his engagement in protected activity in violation of Title VII, 42 U.S.C. §§ 2000 *et seq.*,;

8. For a money judgment representing emotional damages for defendant's retaliation against plaintiff do to his engagement in protected activity in violation of Title VII, 42 U.S.C. §§ 2000 *et seq.*,;

9. For equitable and injunctive relief;

10. For attorney's fees and costs;

11. For such other and further relief as may be just and proper.

9

## **JURY DEMAND**

Plaintiff herein demands a trial by jury of all issues in this action.

Dated: Islandia, New York
October 25, 2019

                        SCOTT MICHAEL MISHKIN, P.C.

                        By:  Scott Michael Mishkin Esq.
                            One Suffolk Square, Suite 240
                            Islandia, New York 11749
                            Telephone: (631) 234-1154
                            Facsimile:  (631) 234-5048
                            *Attorneys for Plaintiff*